1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8  | ARTHUR CLEMENS, JR.,

9  | Plaintiff,

10 | v.

11 | QWEST CORPORATION, a Colorado
   | Corporation and a wholly-owned
12 | subsidiary of CenturyLink, Inc.,

13 | Defendant.

NO.  C13-1793-JPD

ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT

14

15

I.    INTRODUCTION AND SUMMARY CONCLUSION

16        Plaintiff Arthur Clemens, Jr. alleges that his August 2008 termination by his employer

17 defendant Qwest Corporation (hereinafter "Qwest") was discriminatory and retaliatory.

18 Although plaintiff's employment at Qwest was later reinstated by an arbitrator, plaintiff is now

19 seeking back pay and benefits.  Qwest filed the instant motion for summary judgment, arguing

20 that plaintiff was properly terminated for sub-standard performance.  Dkt. 19.  Plaintiff

21 opposes the motion.  Dkt. 26.  After careful consideration of the parties' briefs, the governing

22 law and the balance of the record, the Court DENIES Qwest's motion for summary judgment.

23 Dkt. 19.

24

1

## II.     BACKGROUND

A.     Factual History

1.     *Plaintiff's Employment with Qwest from 1987-2008*

Plaintiff, who is an African American, began working for Qwest (which was formerly known as Pacific Northwest Bell) as an operator in 1987 at the age of sixteen.  Dkt. 27 (Clemens Decl.) at ¶ 2; Dkt. 20, Ex. A (Clemens Dep. at 16:6-25).  Over the years plaintiff was promoted to credit consultant, network technician, and by 2008 he was working as a customer data technician on the cable maintenance crew.  Dkt. 20, Ex. A (Clemens Dep. at 60:7-9, 72:22-73:1).  Customer data technicians, including Mr. Clemens, are highly skilled technicians who are often able to solve problems that others are unable to resolve.  Dkt. 21 (Butler Decl.) at ¶ 12.  As plaintiff's second-level supervisor John Rust described the position, "cable maintenance technicians are the best of the best.  They are the people who fix what everyone else cannot."  Dkt. 22 (Rust Decl.) at ¶ 3.  Plaintiff had a non-existent disciplinary record and no significant performance issues during his over twenty years of employment at Qwest until late 2007.  Dkt. 27 (Clemens Decl.) at ¶ 2.

2.     *Plaintiff's Difficulties with his New Supervisor, Shannon Ridge*

In October 2007, plaintiff rear-ended another vehicle while driving a Qwest truck.  Dkt. 23 (Griffith Decl.) at ¶ 4, Ex. C at 47.  Plaintiff received a written warning for this incident on November 11, 2007.  *Id.*  Plaintiff had been "on loan" to another crew at the time of the accident, and he returned to his regular crew in November 2007 shortly thereafter.  Dkt. 24 (Ridge Decl.) at ¶ 4.

While plaintiff was still "on loan" to the other crew, Shannon Ridge was assigned as the new supervisor of plaintiff's regular crew.  *Id*. at ¶ 3.  Ridge had previously worked as one of plaintiff's co-workers as a cable maintenance technician.  *Id*. at ¶¶ 2-3.  When plaintiff had

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 2

previously worked with Ridge as a co-worker, plaintiff claims that Ridge told him that he and his friends would often drive around looking for black people to "beat up."[1]  Dkt. 27 (Clemens Decl.) at ¶ 4.  Ridge was promoted to supervisor earlier in 2007, and had supervised several different crews before being assigned to plaintiff's crew later that year.  Dkt. 24 (Ridge Decl.) at ¶ 3.  Plaintiff had heard from Michael Green, an African-American technician on the "Valley crew" in South King County that Ridge had previously supervised, that Ridge treated African-American employees unfairly.  *See* Dkt. 29 (Green Decl.) at ¶ 10 (noting that he told plaintiff about prior instances of alleged race discrimination by Ridge on his crew from January 2006-2007, which had prompted Green to file a formal complaint against Ridge with the Washington State Human Rights Commission and Ridge to be transferred to plaintiff's crew in 2007).  Plaintiff had also heard race discrimination complaints about Ridge from at least one other African-American employee.  Dkt. 27 (Clemens Decl.) at ¶ 4.

Shortly after plaintiff's motor vehicle accident, plaintiff was transferred back to his regular crew.  He called and asked Ridge if he was behind the transfer, making it clear that he was not happy about it.  Dkt. 24 (Ridge Decl.) at ¶ 5.[2]  Once plaintiff was working for Ridge, he felt that Ridge was constantly "on his back."  Dkt. 27 (Clemens Decl.) at ¶ 5.  He believed that Ridge's conduct was racially motivated, in part because of what he heard from his African-American co-workers.  *Id.*

Ridge claims that plaintiff was a difficult employee to supervise and had a negative, confrontational attitude.  Dkt. 24 (Ridge Decl.) at ¶ 6.  Specifically, Ridge claims that plaintiff

---

[1] Although this comment may indeed constitute a "stray remark," as Qwest argues, plaintiff does not rely upon this remark alone to raise a triable issue of fact regarding whether Ridge acted with discriminatory intent in disciplining plaintiff.  *See Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438 (9th Cir. 1990).  Ridge's comment is relevant to plaintiff's disparate treatment claim.  *Id.*

[2] During this call, plaintiff also asked Ridge if there was a problem between them, which Ridge says surprised him because he never thought they had any issues.  *Id.*

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 3

interrupted or walked out of crew meetings even when Ridge was talking, and had low quality jobs per day ("QJD") scores, which measures the number of jobs completed in an eight-hour day minus defects (which occurs when a job is not fixed correctly). *Id.* at 6, 8. *See also* Dkt. 21 (Butler Decl.) at ¶ 7 (discussing QJD scores). Ridge claims that plaintiff even advocated to other crew members that they should intentionally fail to meet their QJD performance goals. Dkt. 24 (Ridge Decl.) at ¶ 10.

Ridge asserts that plaintiff's behavior at times was even threatening, as he once asked Ridge if he knew that everyone on the crew "knew where I lived," which concerned Ridge because he has a wife and three kids. *Id.* at ¶ 6. During the same conversation, he asked how Ridge's supervisor, John Rust, "could sleep at night with his prejudice." *Id.* Ridge claims that plaintiff frequently responded to coaching and discipline by threatening to file a lawsuit and making racially charged comments, such as "the Company's doing this to the black man." *Id.* at ¶ 7.

3.  *Plaintiff Encouraged Another African-American Employee to File a Race Discrimination Complaint in March 2008*

Plaintiff is an active member of the Communications Workers of America Local 7800 ("CWA" or "Union"), which represents Qwest technicians in the Seattle area. Dkt. 25 (Edwards Decl.) at ¶ 4. In 2008, plaintiff was a union steward for his crew, which means that he provides representation to other employees during disciplinary meetings, files grievances on behalf of employees, and communicates other union concerns to management. *Id. See also* Dkt. 20, Ex. A (Clemens Dep. at 90:17-18).

As mentioned above, in the months prior to his termination, plaintiff believed that Ridge was treating African-American employees unfairly. In addition to his own experience with Ridge, he had heard from at least two other African-American employees that Ridge

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 4

treated African-American employees unfairly.  Dkt. 27 (Clemens Decl.) at ¶ 5.  When another

African-American co-worker, Boris Owens, told plaintiff about similar experiences with

Ridge, plaintiff encouraged Owens to file an external Equal Employment Opportunity

Commission ("EEOC") race discrimination complaint in March 2008.  *Id.*

On March 31, 2008, Ridge sent an email to his supervisor Rust stating, among other

things, that plaintiff "challenge[s] me on almost everything I state and advocates to others to

. . . fail the QJD performance scoring system.  Art consistently tells me and the crew, he 'wants

to gather information for a law suit (sic) he plans to file.'  Art is unprofessional and mocks and

challenge[s] me in front of the crew daily, I think trying to test my temper."  Dkt. 22 (Rust

Decl.) at ¶ 5, Ex. A at 9.  Ridge also noted in his email that he had been "instructed to gather

information in regards to Art performing Union work on company time and his unprofessional

behavior in the crew room . . . pull Art's March QJD SAT information and to look specifically

at day[s] where Art has only completed one job or less.  Also; to match this type of information

with other information like GPS and Art showing up at other locations other than work

locations."  *Id.*  Finally, Ridge noted that plaintiff's March QJD score had lowered the crew's

average score.  *Id.*

At this time, Ridge had already been interviewed by a Qwest attorney in January 2008

regarding an internal race discrimination complaint that Owens had filed against him in

December 2007.  Dkt. 24 (Ridge Decl.) at ¶ 8.  Ridge admits that "at the time, I believed that

[plaintiff] might have triggered the complaint because he was always encouraging Boris

[Owens] and others to make complaints and with [plaintiff] race was a frequent topic of

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 5

conversation." *Id.*[3]  However, Ridge claims that he did not yet know about Owens' external complaint filed in March 2008. *Id.*

Plaintiff was also interviewed by Qwest's attorney Jenny Chung Savidge about his involvement with Owens' EEOC complaint on approximately April 2, 2008.  Dkt. 27 (Clemens Decl.) at ¶ 6; Dkt. 23 (Griffith Decl.) at ¶ 3, Ex. B at 44-45 (EEO Interview with Plaintiff). During the interview, plaintiff admitted to Savidge that he told Owens to file a formal discrimination complaint against Ridge and that "I have been telling Boris [Owens] to keep track of everything that happens to him.  I'm doing the same myself." *Id.* at 45.

4.      *Plaintiff's Performance in the Months Preceding his Termination*

a.      *Plaintiff Drove a Qwest Truck While Talking on the Phone*
*Without a Hands-Free Device*

On April 1, 2008, Ridge and Rust were driving together when another Qwest vehicle, driven by plaintiff, passed them.  Dkt. 22 (Rust Decl.) at ¶ 6.  The two men saw plaintiff holding his cell phone up to his ear while driving down the road in violation of Qwest's policy forbidding hand-held cell phones while driving.  *Id.*; Dkt. 24 (Ridge Decl.) at ¶ 11.  The next day, when Ridge spoke with plaintiff about the incident, plaintiff immediately admitted to driving and talking on the phone without a hands free device, and asked for a new one because his current device was very used and dirty. Dkt. 27 (Clemens Decl.) at ¶ 8.  Ridge provided a new one to him on April 7, 2008, without indicating that discipline or any investigation would follow.  *Id.*; Dkt. 22 (Rust Decl.), Ex. B at 16 (noting that a new hands-free device was provided to Clemens "yesterday").

---

[3] Ridge asserts that he "understand[s] now that [plaintiff] claims that he encouraged Boris [Owens] to file an EEOC charge against Qwest in March 2008, but I was not aware of that at the time." *Id.*

1

2

                  b.      *Plaintiff's April 8, 2008 Interview with*
                             *Supervisors Ridge and Rust*

3

On April 8, 2008, approximately one week after Qwest's in-house counsel learned that

4

plaintiff had encouraged Owens to file the complaint and plaintiff was observed talking on the

5

phone without a hands-free device, plaintiff and Ridge had an unrelated disagreement during

6

an early morning crew meeting. Dkt. 27 (Clemens Decl.) at ¶ 7. Plaintiff told Ridge they

7

could call the compliance hotline to resolve the issue, which is the same number used to report

8

EEO discrimination concerns. Ridge responded, "I'm sure you have that number on speed

9

dial." *Id.*

10

Later that same day, Ridge summoned plaintiff into the first of what would ultimately

11

be four investigatory interviews. The purpose of an investigatory interview is to give

12

employees an opportunity to explain their side of things, so that management can have all the

13

relevant facts before making a decision about whether some kind of discipline is warranted.

14

Dkt. 25 (Edwards Decl.) at ¶ 5.

15

This first interview lasted three hours. Ridge and Rust asked plaintiff for his

16

understanding with respect to a broad range of company policies, with no description of any

17

alleged violation of those policies by the plaintiff. Dkt. 22 (Rust Decl.) at ¶ 7, Ex. B at 12-20

18

(Notes from Investigatory Interview). Thus, plaintiff was not specifically advised regarding

19

what he had done wrong that necessitated the meeting. *Id. See also* Dkt. 27 (Clemens Decl.)

20

at ¶ 8; Dkt. 24 (Ridge Decl.) at ¶ 12; Dkt. 35 (Higgins Decl.), Ex. D (Rust Dep. at 33:23-34:3)

21

and E (List of interview questions prepared by Rust). For example, they asked plaintiff, "What

22

is your understanding with regards to accuracy of records and time reporting . . . What is your

23

understanding of professionalism . . . Violence in the workplace . . . How long are your breaks

24

and lunch periods . . . When is it appropriate to perform union work on company time?"  Dkt. 22 (Rust Decl.) at ¶ 7, Ex. B at 12-13 (Notes from Investigatory Interview).

With respect to hands-free cell phone use, Ridge noted, "We talked about being on your cell phone, without being on hands-free; tell me the company policy on using phone without hands-free."  *Id.* at 16.  Plaintiff stated that although he understood that not talking on the cell phone while driving is a Qwest tech expectation, he sees his manager, as well as others, do it all the time.  *Id.*  Ridge asked plaintiff, "Does that make it ok?"  *Id.*  Plaintiff responded, "If the company allows everyone to do it.  I'm not perfect either."  *Id.*  Ridge then asked plaintiff "about the interaction this morning with me in the crew room."  *Id.*  Plaintiff described his recollection of their interaction, including Ridge's comment that plaintiff must have the compliance hotline number "on speed dial."  *Id.* at 17.  Plaintiff noted that "[a]fter his comment about having compliance on speed dial, I felt that he was retaliating against me for participating in an ongoing investigation."  *Id.*  Plaintiff also stated that "I feel that this whole meeting is retaliatory."  *Id.*  Neither Ridge nor Rust asked what investigation plaintiff was referring to.  *Id.*  Ridge did ask if plaintiff believed he treated Ridge "with professionalism," and plaintiff responded, "Yes, same professionalism you were treating me with."  *Id.*

Qwest's investigation procedures direct managers to ask about the policies that were allegedly violated by the plaintiff.  *See* Dkt. 35 (Higgins Decl.), Ex. F ("How to conduct an Investigatory Interview").  *See id.,* Ex. G (Edwards Dep. 26:7-16).  In addition, Qwest trains its managers to begin the interview by stating the purpose or reason for the meeting, whereas Ridge and Rust began the April 8 meeting by stating that "the purpose of this meeting is investigatory; to provide you with an opportunity to answer questions.  It could result in disciplinary action.  You are required to comply with this investigation."  Dkt. 27 (Clemens Decl.) at ¶ 10.  During Rust's deposition, the only reason he provided for the first investigatory

interview was related to plaintiff's cell phone use without a hands-free device.  Dkt. 35

(Higgins Decl.), Ex. D (Rust Dep. at 33:23-34:3).  When asked why he and Ridge asked

plaintiff questions about such a wide range of topics, Rust responded, "Just wanted to know his

understanding."  *Id*. at 38:24-42:20.  No discipline issued immediately after the meeting.

> c.  *Supervisor Rust Accused Plaintiff of Failing to Use a Hands-Free Device While Driving a Second Time*

On April 28, 2008, after hearing nothing about the outcome of the first investigatory

interview, plaintiff emailed Rust.  Specifically, plaintiff advised him,

> …shortly after I participated in a eeo investigation I was moved to the late shift and pulled into an investigatory meeting that lasted 3 hours.  I thought that I had answered all of your questions correctly and had done everything [in] accordance to company procedures.  You told me that you would get back to me about the outcome of the investigation.  The meeting was on April 8, 2008 and it is now April 28th, 2008.  Twenty days have gone by and I have not heard anything.  Please let me know what is going on, I find myself very stressed and worried about my job.

Dkt. 27 (Clemens Decl.), Ex. A.  Rust did not respond to plaintiff's email.

Rust claims on that same day, April 28, 2008, he again saw plaintiff talking on his cell

phone without a hands-free device while driving a company truck.  Dkt. 22 (Rust Decl.) at ¶ 8.

Rust contacted Tammy Edwards, Lead Labor and Human Resources Generalist, and asked her

to pull plaintiff's phone records.  Rust claims these records confirmed that plaintiff was on a

call at the time Rust saw him and that GPS records confirmed that plaintiff was in the area at

the time.  *Id*.  *See also* Dkt. 41 (Second Edwards Decl.), Ex. B (phone records).  Plaintiff

denies having made a phone call without using a hands-free device on that date.  Dkt. 27

(Clemens Decl.) at ¶ 11.

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 9

d.   *Plaintiff is Issued a Formal Warning Following an April 29,*
     *2008 Interview with Supervisor Rust*

The parties dispute whether Rust knew about plaintiff's involvement in Owens'
external EEOC charge filed against Ridge prior to plaintiff's April 28, 2008 email.  *See* Dkt. 26
at 5; Dkt. 22 (Rust Decl.) at ¶ 9.  Rust claims that he only knew that Owens had filed an
internal EEO complaint against Ridge several months earlier, because he had been interviewed
by a Qwest attorney regarding that charge in February 2008.  Dkt. 22 (Rust Decl.) at ¶ 9.

In any event, plaintiff was pulled into a second investigatory interview with Rust the
next day, with Ridge taking notes.  Dkt. 27 (Clemens Decl.) at ¶ 11.  Plaintiff received no prior
notice of the April 29 interview, and therefore requested an opportunity to speak with his union
steward, Candi Scaiola, alone at the beginning of the meeting.  Rust denied him that
opportunity.  *Id.  See also* Dkt. 32 (Scaiola Decl.) at ¶ 2.

During the meeting, Rust accused plaintiff of talking on his cell phone while driving
without using his hands-free device the day before.  Dkt. 22 (Rust Decl.), Ex. C at 22-23
(Notes from Investigatory Interview).  Plaintiff laughed and accused Rust of lying and
retaliating for plaintiff's involvement in the EEO complaint.  Dkt. 22 (Rust Decl.) at ¶ 8; Dkt.
32 (Scaiola Decl.) at ¶ 3.  Plaintiff's union steward Scaiola, who was also present, also
"laughed because it was so clear that John Rust had invented the cell phone incident . . .
Whenever I would see Art, he always had a hands-free device in his ear . . . It was so ridiculous
and unbelievable that it was laughable."  Dkt. 32 (Scaiola Decl.) at ¶ 3.  Rust advised plaintiff,
"I am not aware of any complaint and I would advise you not to talk about it to anyone else."
Dkt. 22 (Rust Decl.), Ex. C at (Notes from Investigatory Interview).  Contrary to this
statement, however, Rust admits in his declaration that he had learned about plaintiff's
involvement with Owens' complaint the day before, when plaintiff e-mailed him.  Dkt. 22

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 10

(Rust Decl.) at ¶ 8.  Although Ridge's notes from the meeting indicate that plaintiff "started to yell" at Rust, Scaiola states that "[a]t no time during this investigatory interview did Art yell or scream.  Though Art was frustrated and upset that Rust was falsely accusing him, he showed remarkable restraint during the interview."  Dkt. 32 (Scaiola Decl.) at ¶ 5.[4]

On May 5, 2008, Ridge gave plaintiff a written warning for his repeated use of his cell phone without a hands-free device while driving.  Dkt. 24 (Ridge Decl.) at ¶ 14; Ex. A at 9.  During this meeting, plaintiff again stated that Rust was lying, commenting that Ridge "provided me with a hands-free that I keep plugged in.  Why would I take that out?"  *Id.*, Ex. B at 12 (Ridge's notes from the meeting).

     e. *Plaintiff Filed an EEO Complaint Against Rust in Early May 2008, which was Reported to Qwest Management*

Shortly after plaintiff was issued the written warning, plaintiff called the internal EEO hotline to report discrimination and retaliation by Rust.  Dkt. 39 (Second Butler Decl.) at ¶ 3, Ex. B.  According to the Call Report Summary, which was emailed by a representative from the Qwest Ethics and Compliance Advice Line directly to Qwest's Director of Network Service Operations Brad Butler (who ultimately terminated plaintiff), plaintiff described the events and investigatory meetings that had taken place in April and claimed that Rust's actions were motivated by racism and a desire to retaliate.  *Id.*  Plaintiff reported that Rust and Ridge

---

[4] Following the meeting, Rust again contacted Edwards and advised her about the "investigatory with Art today regarding his cell phone use while driving a company vehicle, he claims we are retaliating for an EEO investigation he participated in and when I asked him to be more specific he replied, you mean there's more than one.  Anyway thought I'd give you a heads up on this because I'm sure somehow you and I will be talking more about this one in the future."  Dkt. 22 (Rust Decl.), Ex. A.  Meanwhile, plaintiff sent an email to Qwest's in house attorney, Jenny Chung Savidge, saying that he was being harassed by Rust and asking to talk to her about it.  Dkt. 27 (Clemens Decl.) at ¶ 11, Ex. B.

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 11

1   were generally hostile to him, rude to him, and stared at him, and that the situation had caused

2   him stress, loss of sleep, and unfairly blemished his record. *Id.*

3          Butler exchanged emails regarding plaintiff's complaint with Edwards, Qwest's Labor

4   Relations Manager, on May 27, 2008. *See* Dkt. 25 (Edwards Decl.) at ¶ 7; Dkt. 25 (Edwards

5   Decl.), Ex. B (email exchange between EEO representative, Butler and Edwards).  Edwards

6   commented that "there was some concern that Art Clemens was pushing Boris [Owens] to

7   report that he was being discriminated against" and "shortly after that case was closed now we

8   have this report . . . I have some concerns because now we have gone from allegations about

9   Shannon [Ridge] to John [Rust].  I worry that [as] Brad gets involved then it will include him

10  as there already is a comment in the last sentence to allude to this." Dkt. 39 (Second Butler

11  Decl.), Ex. B (email exchange between EEO, Butler and Edwards).  Finally, Edwards

12  expressed her belief that the "case should be handled by EEO." *Id.*  In her declaration,

13  Edwards asserts that "[a]t my request, the complaint was handled by our internal EEO

14  investigation team." *See* Dkt. 25 (Edwards Decl.) at ¶ 7.  It is unclear, however, what this

15  investigation entailed, as there is no information about it in the record.

16                    f.      *Qwest Holds Plaintiff Responsible for Three Customer Service*
                              *Outages During a Two-Week Period in May and early June 2008*

17          Qwest alleges that in late May and early June 2008, plaintiff caused two customer

18  outages and failed to fix a third customer outage.  The first incident took place on May 29,

19  2008, at the Manson Construction site. Dkt. 21 (Butler Decl.), Ex. F at 91.  Plaintiff pinched

20  some wires in the lip of a metal case while completing the job.  Qwest asserts that if plaintiff

21  had "flash tested" the case to ensure that the case has a tight seal, he would have discovered the

22

23

24

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 12

pinched wires and the outage would have been avoided.  Dkt. 21 (Butler Decl.) at ¶ 10.[5]

Plaintiff testified that he was unable to flash test the case, which is proper procedure, because he did not have dry air in his compressor at the time.  Dkt. 20 (Janke Decl.) at ¶ 2, Ex. A at 26 (Clemens Dep. 141:6-142:12).  Specifically, plaintiff's air compressor had been replaced with a used compressor on May 23, 2008.  Dkt. 27 (Clemens Decl.) at ¶ 15.  This replacement compressor was delivered to plaintiff in the field.  Immediately after the compressor was replaced, and before the Manson Construction job, plaintiff advised Ridge that the replacement was not working and Ridge told him to just "do the best you can."  Dkt. 27 (Clemens Decl.) at ¶ 15, Ex. C (compressor service records); Dkt. 20 (Janke Decl.), Ex. A (Clemens Dep. 142:16-143:3); Dkt. 24 (Ridge Decl.) at ¶ 15.  In addition, immediately after the Manson Construction outage on May 29, plaintiff "again told Ridge that my compressor was not working, and that it was the cause of the Manson Construction outage.  Yet I was still told to do work without a fully functional air compressor."  Dkt. 27 (Clemens Decl.) at ¶ 15; Dkt. 24 (Ridge Decl.) at ¶ 15.  Jim Salisbury, a mechanic for Qwest who was personally responsible for  repairing plaintiff's truck, including his dry air compressor, testified that although plaintiff's compressor "pushed air, the gauge on the compressor was broken, unbeknownst to me.  Because of the gauge malfunction, Art Clemens could reasonably have believed that the dry air compressor was broken."  Dkt. 35 (Higgins Decl.), Ex. S (Salisbury Decl.) at ¶¶ 4-5.

A few days later, on June 3, 2008, plaintiff again failed to flash test a splice case near SeaTac Airport.  Dkt. 21 (Butler Decl.), Ex. F at 92; Dkt. 20 (Janke Decl.) at ¶ 2, Ex. A at 26

---

[5] To flash test a case, a technician places a soap and water solution on the outside of the case and forces dry air into the case from a compressor on the technician's service truck.  *Id.*  If bubbles appear on the outside of the case, the seal is not tight and the technician can troubleshoot the problem.  *Id.*  It is undisputed that plaintiff did not perform this test, and therefore failed to notice that he had pinched the cables.  Dkt. 27 (Clemens Decl.) at ¶ 12.

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 13

1   (Clemens Dep. 144:1-7).  Plaintiff was dispatched on that job as a helper to Boris Owens.

2   Water eventually seeped into the case, causing service to go out for eleven hours for several

3   customers including AT&T, Expeditors International, and Sprint.  Dkt. 21 (Butler Decl.), Ex. F

4   at 92; Dkt. 24 (Ridge Decl.) at ¶ 17.  They also did not replace a sealant cord, which Qwest

5   argues resulted in the replacement of an entire section of the cable at a cost of $6,500.00.  *Id.*

6        Plaintiff states that he was unable to flash test the case because the gauge on his air

7   compressor still indicated the dry air was not working.  Dkt. 27 (Clemens Decl.) at ¶ 17.

8   Plaintiff asserts that this particular section of cable at the SeaTac site was problematic long

9   before he worked on it on June 3, and for months after because there was a leak in the entrance

10  cable that ran under the street and therefore "there was nothing I could have done to prevent

11  that cable from going wet again."  *Id.*[6]  Plaintiff has submitted a declaration from Vernon

12  Steward, a manager of a service assurance crew that identified problematic cables, to support

13  his assertion that the SeaTac cable continued to "go wet, causing service outages" after

14  plaintiff had been terminated, and "there is nothing any technician could have done to prevent

15  this cable from going wet again" because a technician cannot replace the damaged cable.  Dkt.

16  34 (Steward Decl.) at ¶¶ 3-5.  *See also* Dkt. 28 (Markhart Decl.) at ¶ 5 (noting that after

17  plaintiff was fired the SeaTac cable again went wet and was out of service despite the cable

18  being dried and pressurized); Dkt. 30 (Wylie Decl.) at ¶ 5 (noting that the SeaTac cable went

19  wet again, although two other employees worked on the cable after plaintiff); Dkt. 31 (Owens

20  Decl.) at ¶ 9 (noting that the SeaTac cable was wet again despite numerous technicians'

21  attempts to fix it and therefore the problem was from a wet cable, not plaintiff's failure to

22  pressurize the case).

23        [6] Plaintiff asserts that in fact, he worked on that section of cable on his very first day as
    a CMT (as well as several other occasions over the years) and it had the same problem then.
24  Dkt. 27 (Clemens Decl.) at ¶ 17.

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 14

1    Qwest concedes that plaintiff was having problems with his air compressor prior to the

2    outages, but asserts that plaintiff's air compressor was repaired just days before the events that

3    resulted in the outages and therefore the dry air was functional at the time.  Plaintiff asserts that

4    service records indicate that his air compressor was repaired much later than Qwest claims –

5    on July 3, 2008.  Dkt. 27 (Clemens Decl.), Ex. C.  Moreover, on July 18, 2008, when Butler,

6    plaintiff, and union representative Wylie jointly inspected the compressor after a July 18

7    meeting with plaintiff, the compressor gauge on his air compressor was still not working.  Dkt.

8    21 (Butler Decl.) at ¶ 17; Dkt. 20 (Janke Decl.) at ¶ 3, Ex. B at 42 (Wylie Dep. 48:11-12).

9    Finally, plaintiff was dispatched to a 24-hour Burger King on June 2, 2008 after the

10   restaurant reported that it had lost telecommunication service and could not perform credit or

11   debit card transactions.  Dkt. 22 (Rust Decl.) at ¶ 13.  Plaintiff was unable to restore service,

12   and the 24-hour Burger King remained offline overnight.  *Id.*  The next day, plaintiff explained

13   to his supervisors that he had been unable to locate the universal digital carrier ("UDC") box,

14   which creates multiple dial tones from one pair of cables, and was therefore unable to repair

15   the outage.  *Id.*; Dkt. 21 (Butler Decl.) A at ¶ 12.  Plaintiff asserts that the Burger King

16   manager on duty at the time did not know where the box was located and therefore could not

17   help him find it.  Dkt. 27 (Clemens Decl.) at ¶ 18.  He thought the UDC box might have been

18   in the ceiling, but he did not have the proper ladder to check it.  Dkt. 22 (Rust Decl.) at ¶ 13.[7]

19   When Ridge went to the site the following day with another technician, an employee on

20   duty at the time led them right to the UDC box which was improperly located just off the floor

21   in a storage room behind a mop and some Styrofoam cups.  Dkt. 24 (Ridge Decl.) at ¶ 16; Dkt.

22   35, Ex. C (Ridge Dep. 49:2-50:15).  *See also* Dkt. 35 (Higgins Decl.), Ex. I (photograph of the

23

24   _____

[7] Plaintiff points out that two other Caucasian technicians were unable to restore service
to the Burger King on the same day.  Dkt. 35 (Higgins Decl.), Exs. K and L.

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 15

box).  The technician was able to fix the problem and restore service to the customer.  Dkt. 24 (Ridge Decl.) at ¶ 16.

g. *Qwest Accuses Plaintiff of Misreporting Time on June 8, 2008*

Qwest measures the productivity of its cable technicians, in part, through Workforce Administration ("WFA") records, which are records containing key information about jobs such as what work needs to be done, who was dispatched on the job, when the technician was dispatched, and when the job is completed.  Dkt. 21 (Butler Decl.) at ¶ 8.  Qwest also keeps Global Positioning System ("GPS") records for its vehicles, which can be compared with a technician's WFA records to determine whether a technician's WFA records are accurate.  *Id.*[8]

On Sunday, June 8, 2008, plaintiff worked a partial shift at a premium rate of time and a half.  *Id.* ¶ 15.  During this shift, he was assigned to three different jobs.  *Id.*  However, his WFA records for that day differ from where the GPS showed him to be located at various times.  Specifically, although his WFA records show that he was dispatched at 8:13 a.m. and completed his first job at 9:49 a.m., his GPS shows that he left his first job at 9:39 a.m. and traveled to a nearby shopping area and parked near a Starbucks and several restaurants.  *Id.* at ¶ 18, Ex. F at 92.  Although his WFA records indicate that he dispatched to his second job at 9:50 a.m., he actually remained parked near the Starbucks location until 10:18 a.m.  Dkt. 21 (Butler Decl.) at ¶ 15.  Once plaintiff completed his second job for the day, he drove to his third job at 11:23 a.m. without closing out the second job.  When he completed the third job, he closed out the second job, and then indicated that he dispatched to the (already-completed) third job.  *Id.*  Plaintiff then returned to the same shopping center near a Starbucks.  Once he arrived there, he closed out of the third job at 12:34 p.m.  *Id.*  Thus, Qwest argues that the

---

[8] Plaintiff argues that this practice violates Qwest's express policy, because when Qwest notified employees that GPS was being installed on its vehicles, it stated: "In no way, will GPS records be used for disciplinary reasons."  Dkt. 35 (Higgins Decl.), Ex. M.

1  discrepancy between plaintiff's WFA records and GPS records show that plaintiff took an

2  approximately 30-minute morning "coffee break" at a nearby Starbucks, inaccurately reported

3  the time spent on his second job, and failed to close out of his third job until 23 minutes after it

4  was actually completed.  *Id.*

5       Plaintiff asserts that he was initially assigned to only two jobs, and upon completing the

6  first job, he saw that the second job did not need to be completed that day so he called Ridge to

7  ask if he should go home rather than complete the second job on a premium day.  Dkt. 27

8  (Clemens Decl.) at ¶ 19.  Ridge said he would find out and call plaintiff back.  Expecting to be

9  sent home, plaintiff waited at a coffee shop for Ridge to return his call and took his 15-minute

10 break during part of this time.  Plaintiff asserts that he was honest with Ridge about what he

11 was doing.  *Id.*  When Ridge called plaintiff, he instructed him to complete the second job.  *Id.*

12 at ¶ 20.  Plaintiff had a helper on his second and third job, and so upon completing his portion

13 of the second job plaintiff drove to a place where he would meet up with S.M. to go to the third

14 job.  He and S.M. then made an honest mistake and forgot to close out the second job and

15 dispatch on the third job, and did not realize their error until they went to close out the third

16 job.  *Id.*  At that time, they closed out the second job, and plaintiff then remained dispatched on

17 the third job for the time he estimated he actually spent on that job.  *Id.*  Plaintiff asserts that he

18 did not charge the company for additional time, but took his paid lunch break, clocking out 30

19 minutes after he completed his third job.  *Id*. at ¶ 21.[9]  *See also* Dkt. 29 (Green Decl.) at ¶ 11

20 (noting that technicians in the field must always be dispatched on a job in their WFA records,

21 and so there are always times when WFA records show the technician is dispatched on a job

22 when they are actually taking a break).  Plaintiff asserts that although he explained these facts

23 ─────────────────

24 [9] Plaintiff points out that Qwest did not discipline or even investigate his helper, S.M., about this conduct, although S.M. was still working at Qwest at the time of plaintiff's termination.  Dkt. 27 (Clemens Decl.) at ¶ 22.

1   to his supervisors, Qwest did not examine plaintiff's phone records that day to confirm

2   plaintiff's calls to Ridge.  Dkt. 27 (Clemens Decl.) at ¶ 23.

3                    h.      *Investigatory Interviews on June 23 and July 28, 2008*

4           On June 23, 2008, two other managers who did not work closely with plaintiff, first-

5   level supervisor Richard Radunz and second-level manager Rebecca Flores, interviewed

6   plaintiff about the three customer service outages.  Dkt. 21 (Butler Decl.) at ¶ 14, Ex. C at 51-

7   66.  They reported that plaintiff was "uncooperative" during that interview, and their report

8   contributed in part to the decision to fire plaintiff.  *See id.* (Notes from investigatory interview).

9   In her deposition, Flores opined that plaintiff was "uncooperative" because he was not giving

10  full answers and was "[t]hrowing in other comments about retaliatory (sic)."  Dkt. 35, Ex. N

11  (Flores Dep. 18:13-21).  However, Flores could not explain the basis for her opinion that

12  plaintiff was not providing full answers to the questions.  *Id.* (Flores Dep. 16:25-17:10).

13  Radunz also called plaintiff's complaint of retaliation "inappropriate."  Dkt. 35 Ex. J (Radunz

14  Dep. 13:12-20).  Plaintiff asserts that he attempted to answer their questions, despite his

15  concerns about retaliation, and explained that he had been unable to flash test the cases because

16  his compressor was not working.  Dkt. 27 (Clemens Decl.) at ¶ 11; Dkt. 21 (Butler Decl.), Ex.

17  C at 57.  At the conclusion of the interview, Flores and Radunz called Qwest's Director of

18  Network Service Operations Brad Butler to discuss next steps.  Dkt. 21 (Butler Decl.) at ¶ 14.

19  Clemens was then suspended.  *Id.*

20          On July 18, 2008, Butler interviewed plaintiff himself.  Dkt. 21 (Butler Decl.) at ¶ 16,

21  Ex. E at 71 (notes from investigatory interview).  During the interview, plaintiff again

22  explained that he did not have a working air compressor during the Manson Construction and

23  SeaTac jobs, and explained the reasons for his actions on June 8, suggesting that Butler check

24  his phone records to verify that he had placed two phone calls to Ridge asking if he should go

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 18

home.  Dkt. 27 (Clemens Decl.) at ¶ 23.  Butler did not do this before terminating plaintiff.  *Id.*; Dkt. 30 (Wylie Decl.) at ¶ 4.

During his deposition, Butler stated that although he had already reviewed the typewritten notes from the previous interviews and found that plaintiff's answers were neither incomplete nor inadequate, he nevertheless repeated many of the same questions during the final investigatory interview as "standard protocol."  Dkt. 35 (Higgins Decl.), Ex. H (Butler Dept. 69:2-12).  Plaintiff's union representative at the meeting, Stan Wylie, advised plaintiff not to answer the same questions he had answered previously.  Dkt. 30 (Wylie Decl.) at ¶ 3; Dkt. 27 (Clemens Decl.) at ¶ 13.  Butler did not, however, caution plaintiff at that time that failure to respond would result in his termination.[10]  Plaintiff refused to answer many of Butler's questions, saying that he had answered the question before or could not remember the answer.  Dkt. 21 (Butler Decl.) at ¶ 16, Ex. E at 72, 74, 75-76, 79-80.  Plaintiff remained suspended after this interview.  Dkt. 21 (Butler Decl.) at ¶ 18.

### 5.    *Qwest terminated Plaintiff on August 4, 2008*

Butler terminated plaintiff on August 4, 2008.  Dkt. 27 (Clemens Decl.) at ¶ 13; Dkt. 21 (Butler Decl.) at ¶ 18, Ex. F at 91-98; Dkt. 35, Ex. H (Butler Dep. 71:8-72:1).  Qwest claims that Butler's decision to terminate plaintiff was based upon plaintiff's four significant performance issues in less than two weeks, his refusal to cooperate during the interviews, and his refusal to accept responsibility.  Dkt. 21 (Butler Decl.) at ¶ 18.

Plaintiff argues these reasons are pretextual, and points out that Butler conceded that "failure to take responsibility" is not part of the formal criteria established by policy but is a

---

[10] Qwest's procedure is that "if the person isn't answering the questions, to let them know that this is their opportunity to give their side of the story, and if they don't cooperate or answer the question, that basically then the company's going to have to make a decision based upon the facts that are before us."  Dkt. 35, Ex. G (Edwards Dep. 23:24-24:6).

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 19

1   subjective determination made by Butler.  Dkt. 35, Ex. H (Butler Dep. 36:15-20).  Butler also

2   considered input from his management team, including Rust and Ridge, who described

3   plaintiff to Butler as "divisive" and "counseling the workforce against management."  *Id.* at

4   42:10-14.  Furthermore, Butler considered input from Ridge and Flores, who described

5   plaintiff as being "uncooperative" during his June 23 investigatory interview in part because he

6   voiced concerns about retaliation.  Dkt. 35, Ex. N (Flores Dep. 18:13-21).

7        B.     Procedural History

8        After plaintiff's termination, plaintiff filed a grievance through his union, and the

9   matter went to arbitration.  The union did not present any evidence or argument about race

10  discrimination or retaliation at the arbitration.  Dkt. 27 (Clemens Decl.) at ¶ 25; Dkt. 33

11  (Sorensen Decl.) at ¶ 3 (stating that as plaintiff's representative at his union arbitration hearing,

12  he "made the strategic decision not to pursue claims of race discrimination or retaliation" and

13  therefore "did not present evidence related to those potential claims.");  Dkt. 23 (Griffith Decl.),

14  Ex. A at 34-41 (arbitrator's decision).  The arbitrator ordered plaintiff to be "reinstated, with

15  full uninterrupted seniority, but without back pay or benefits, with the time between his initial

16  suspension pending investigation and possible discharge and his reinstatement to be treated as

17  a time-served disciplinary suspension."  Dkt. 23 (Griffith Decl.), Ex. A at 41.

18        The Washington State Human Rights Commission conducted an investigation for over

19  four years, and interviewed numerous witnesses.  Dkt. 35 (Higgins Decl.) at ¶ 18, Ex. Q.  The

20  Human Rights Commission ultimately concluded in favor of plaintiff and against Qwest on the

21  race discrimination and retaliation claims at issue in this case, finding "the preponderance of

22  the evidence supports a finding that [plaintiff] was subjected to different treatment discharge

23  based on race, [and] different treatment terms and conditions of employment and retaliation for

24  opposing an unfair practice . . ." *Id.*

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 20

On September 4, 2013, plaintiff filed his complaint in King County Superior Court.  On October 4, 2013, defendant removed the case to this Court.  Dkt. 1; Dkt. 12 (as amended).  Plaintiff seeks compensatory damages for past and future lost wages and benefits, general and emotional distress damages, punitive damages, attorney fees and costs, and injunctive relief prohibiting defendant from engaging in discriminatory and retaliatory practices.  Dkt. 12 at 5.

III.     DISCUSSION

A.     Legal Standard for Summary Judgment

On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party.  *Addisu v. Fred Meyer, Inc.,* 198 F.3d 1130, 1134 (9th Cir. 2000).  A moving party is entitled to summary judgment when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  An issue of fact is "genuine" if it constitutes evidence with which "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  That genuine issue of fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.*

In response to a properly supported summary judgment motion, the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts demonstrating a genuine issue of material fact for trial and produce evidence sufficient to establish the existence of the elements essential to his case.  *See* Fed. R. Civ. P. 56(e).  A mere scintilla of evidence of insufficient to create a factual dispute.  *See Anderson*, 477 U.S. at 252.

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 21

B.    Plaintiff's Title VII Claims for Disparate Treatment and Retaliation

1.    *Legal Standards for Race Discrimination and Retaliation*

Title VII makes it an unlawful employment practice to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2.  In other words, disparate treatment occurs "where an employer has treated a particular person less favorably than others because of a protected trait." *Wood v. City of San Diego,* 678 F.3d 1075, 1081 (9th Cir. 2012).

When a defendant moves for summary judgment in an employment discrimination case, the plaintiff alleging disparate treatment may respond in one of two ways. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004); *Costa v. Desert Palace, Inc*., 299 F.3d 838, 855 (9th Cir. 2002).  "[A] plaintiff may produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the defendant's decision, or alternatively may establish a prima facie case under the burden-shifting framework set forth in *McDonnell Douglas* [*Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)]."[11]  *Dominguez–Curry v. Nevada Transp. Dep't,* 424 F.3d 1027, 1037 (9th Cir. 2005). *See also McGinest*, 360 F.3d at 1122; *Costa*, 299 F.3d at 855.

---

[11] At the first step of *McDonnell Douglas,* the plaintiff must establish a prima facie case of discrimination or retaliation.  If the plaintiff makes out her prima facie case of either discrimination or retaliation, the burden then "shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory [or retaliatory] conduct." *Vasquez v. County of Los Angeles,* 349 F.3d 634, 640 (9th Cir. 2003).  Finally, at the third step of the *McDonnell Douglas* framework*,* if the employer articulates a legitimate reason for its action, "the presumption of discrimination drops out of the picture, and the plaintiff may defeat summary judgment by satisfying the usual standard of proof required ... under Fed. R. Civ. P. 56(c)." *Cornwell v. Electra Cent. Credit Union,* 439 F.3d 1018, 1028 (9th Cir. 2006) (citations and internal quotation marks omitted).

1    In this case, plaintiff has chosen to proceed under the first path, rather than the

2  *McDonnell Douglas* framework.  *See* Dkt. 26 at 18.  *See also Metoyer v. Chassman*, 504 F.3d

3  919, 931 (9th Cir. 2007) (holding that although the *McDonnell Douglas* burden shifting

4  framework is a useful tool to assist at the summary judgment stage, nothing compels the parties

5  to invoke the *McDonnell Douglas* presumption and the plaintiff may instead "simply produce

6  direct or circumstantial evidence demonstrating that a discriminatory reason more likely than

7  not motivated the employer.").  Thus, to defeat summary judgment on his race discrimination

8  claim, plaintiff must offer direct or circumstantial evidence "that a discriminatory reason more

9  likely motivated the employer" or "that the employer's proffered explanation is 'unworthy of

10  credence' because it is internally inconsistent or otherwise not believable."  *Anthoine v. North*

11  *Central Counties Consortium,* 605 F.3d 740, 753 (9th Cir. 2010) (citing *Chuang v. Univ. of*

12  *Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1127 (9th Cir. 2000)).[12]

13    Title VII also prohibits retaliation by making it unlawful "for an employer to

14  discriminate against any of [its] employees . . . because [he] has opposed any practice that is

15  made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e–3(a).  To

16  establish a prima facie case of retaliation, a plaintiff must show (1) involvement in a protected

17  activity, (2) an adverse employment action, and (3) a causal link between the two.  *Thomas v.*

18  *City of Beaverton*, 379 F.3d 802, 811 (9th Cir. 2004); *Stegall v. Citadel Broadcasting Co.,* 350

19  F.3d 1061, 1074 (9th Cir. 2003).  To establish causation under Title VII, plaintiff must prove

20  that his protected activity was the "but-for" cause of the adverse employment action.  *See Univ.*

21

22    [12] Although Qwest argues in its summary judgment motion that "where an employee
relies on circumstantial evidence to support his claims, courts use the *McDonnell Douglas*

23  framework," Qwest does not continue to argue in its reply brief that the *McDonnell Douglas*
framework is mandatory.  Dkt. 19 at 19.  Instead, Qwest argues that there are no genuine issues

24  of material fact.

1    *of Texas S.W. Med. Ctr. v. Nassar*, __ U.S. __, 133 S.Ct. 2517, 2534, 186 L.Ed.2d 503 (2013)

2    (holding that "a plaintiff making a retaliation claim under [Title VII] must establish that his or

3    her protected activity was a but-for cause of the alleged adverse action by the employer").

4        Thus, for race discrimination claims, a plaintiff need only show that "the motive to

5    discriminate was one of the employer's motives, even if the employer also had other, lawful

6    motives." *Id.* at 2523.  For claims of retaliation, on the other hand, a plaintiff must meet a

7    higher standard: "Title VII retaliation claims require proof that the desire to retaliate was the

8    but-for cause of the challenged employment action." *Id.* at 2528.  *See Ellorin v. Applied*

9    *Finishing, Inc.*, 966 F.Supp.2d 1070, 1089-90 (W.D. Wash. 2014) (noting that "Nassar created

10   a new burden on plaintiffs to show but-for causation in Title VII retaliation claims.").

11       Even but-for causation, however, may be "inferred from circumstantial evidence, such

12   as the employer's knowledge that the plaintiff engaged in protected activities and the proximity

13   in time between the protected action and the allegedly retaliatory employment decision."

14   *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987); *Ray v. Henderson*, 217 F.3d 1234,

15   1244 (9th Cir. 2000) ("That an employer's actions were caused by an employee's engagement

16   in protected activities may be inferred from proximity in time between the protected action and

17   the allegedly retaliatory employment decision.").  *See also Clark Cnty. Sch. Dist. v. Breeden*,

18   532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam) (providing that for an

19   employee to establish causation in a prima facie case of retaliation only on the basis of

20   "temporal proximity between an employer's knowledge of protected activity and an adverse

21   employment action, . . . the temporal proximity must be very close").

22

23

24

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 24

1

2          2.      *Genuine Issues of Material Fact Preclude Summary Judgment on*
                    *Plaintiff's VII Claims of Race Discrimination and Retaliation*

3          Plaintiff's evidence supporting his race discrimination claim largely overlaps with the

4   evidence supporting his retaliation case.  As a result, the Court considers the evidence together.

5   Construing the facts in the light most favorable to plaintiff, there is sufficient evidence in the

6   record for a reasonable jury to find that a discriminatory reason more likely than not motivated

7   Qwest to discipline, and ultimately terminate, plaintiff.  Similarly, there is sufficient evidence

8   in the record for a reasonable jury to find that plaintiff's protected activity, including his own

9   complaints about race discrimination by his supervisors as well as his encouragement of such

10  complaints by another African American employee, was a "but-for" cause of Qwest's decision

11  to terminate him.

12         a.      *Qwest's Singling Out of Plaintiff for Discipline Due to Cell*
                   *Phone Use Without a Hands-Free Device May Evince*
13                 *Discriminatory Intent*

14         As discussed above, plaintiff concedes that he was driving and talking on his cell phone

15  without a hands free device on April 1, 2008.  Dkt. 27 (Clemens Decl.) at ¶ 8.  When he was

16  confronted about this breach of company policy by Ridge, he asked for and was given a new

17  hands free device.  Dkt. 22 (Rust Decl.), Ex. B at 16 (noting that a new device was provided to

18  plaintiff on April 7).  At the time, plaintiff was not given any indication by Ridge that

19  discipline would follow.  Nevertheless, a three-hour "investigatory interview" followed on

20  April 8, 2008, during which Ridge and Rust asked plaintiff questions about a myriad of

21  company policies without indicating the purpose of the meeting or whether plaintiff had

22  violated any of the policies being asked about.  Dkt. 22 (Rust Decl.), Ex. B.  This practice

23  appears to have been contrary to Qwest's own policies regarding proper protocol for such

24  interviews, and Rust was unable to provide any justification for asking questions about such a

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 25

1   wide range of topics.  *See* Dkt. 35 (Higgins Decl.), Ex. F; Dkt. 35 (Higgins Decl.), Ex. D (Rust

2   Dep. at 38:24-42:20).

3           Before the first investigatory interview, plaintiff had heard Ridge state (when the two

4   men were still co-workers) that he and his friends drove around looking for African Americans

5   to "beat up."  Dkt. 27 (Clemens Decl.) at ¶ 4.  Since Ridge had been assigned as plaintiff's

6   manager, plaintiff felt that Ridge treated him unfairly compared with Caucasian co-workers

7   and was constantly "on his back."  *Id.* at 5.  He had also heard from at least two other African-

8   Americans that Ridge had treated African-Americans on his crew unfairly, and gave

9   preferential treatment to Caucasian employees.  *Id.*; Dkt. 29 (Green Decl.) at ¶ 10; Dkt. 31

10  (Owens Decl.) at ¶ 6.

11          The parties' disagreement regarding whether plaintiff was driving while talking on the

12  phone without using his hands free device on a second occasion in April 2008 presents an issue

13  of fact.  *See* Rust Decl. at ¶ 8; Dkt. 27 (Clemens Decl.) at ¶¶ 9, 11; Dkt. 32 (Scaiola Decl.) at ¶

14  3 (noting that "Whenever I would see Art, he always had a hands-free device in his ear.").

15  Rust claims that he saw plaintiff holding his phone to his ear while driving on April 28, 2008,

16  the same day that plaintiff sent Rust an email describing plaintiff's encouragement of Owens'

17  EEOC claim.  *See* Dkt. 22 (Rust Decl.) at ¶ 8.  *See also* Dkt. 41 (Second Edwards Decl.) at ¶ 3,

18  Ex. B (phone records showing plaintiff was on the phone around 7 p.m. on April 28, 2008,

19  when Rust claims to have seen him).  Plaintiff claims that Rust falsely claimed that he was

20  talking without his hands-free device as retaliation for plaintiff's protected activity.  Dkt. 27

21  (Clemens Decl.) at ¶¶ 9, 11.

22          Rust held a second investigatory interview with plaintiff on April 29, 2008, and denied

23  any knowledge of a race discrimination claim during that meeting, despite the fact that plaintiff

24  sent him an email about it the day before.  Dkt. 22 (Rust Decl.), Ex. C (notes from

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 26

investigatory interview); Dkt. 22 (Rust Decl.) at ¶ 9 ("I first learned of Art's involvement in an EEO investigation on the evening of April 28, 2008, when Art sent me an email stating that he had participated in an EEO investigation.")[13]  Moreover, Rust already "knew that Owens had filed an internal EEO complaint against Shannon Ridge several months before[.]"  Dkt. 22 (Rust Decl.) at ¶ 9**.**  On May 5, 2008, plaintiff was disciplined and issued a written warning for his cell phone use while driving.  Dkt. 24 (Ridge Decl.) at ¶ 14; Ex. A.

Plaintiff has provided evidence that at the time he was investigated and disciplined for cell phone use without a hands free device, it was common for Qwest employees  - including Ridge and Rust - to drive Qwest trucks while talking on their cell phones without using hands free devices.  *See* Dkt. 28 (Markhart) at ¶ 4 (noting that "any of us could have been disciplined for [not using a hands free device while driving], but Art was the only one in our crew who was.  Art was using a hand's free device on his phone before it was even required.  Many employees did not use their hand's free device *after* it was required by Qwest."); Dkt. 31 (Owens Decl.) at ¶ 7 ("During this time (2008), I personally saw many employees and supervisors talking on their cell phones without a hands-free device while driving, including Shannon Ridge and his manager, John Rust.").  In fact, most of the employees on plaintiff's crew did not even have hands free devices at the time.  Dkt. 31 (Owens Decl.) at ¶ 7 (noting that "Art and I were the first two employees in our crew to get hands-free devices.  Others just held the phone up to their ear.").  However, only plaintiff was investigated and disciplined.  Viewing the evidence in the light most favorable to plaintiff, a reasonable jury could find that a

---

[13] The parties also dispute whether plaintiff behaved professionally during the meeting.  Ridge's notes indicate that plaintiff started to yell at Rust, whereas plaintiff's union representative claims that "at no time during this investigatory interview did Art yell or scream," but rather "he showed remarkable restraint during the interview."  Dkt. 22 (Rust Decl.), Ex. C; Dkt. 32 (Scaiola Decl.) at ¶ 5.

1   discriminatory reason more likely than not motivated  Ridge and Rust to single out plaintiff

2   and discipline him for this breach of Qwest policy.  *See* Dkt. 31 (Owens Decl.) at ¶ 7; Dkt. 28

3   (Markhart Decl.) at ¶ 4.

4        In addition, there is sufficient evidence in the record for a reasonable jury to find that

5   plaintiff's protected activities were a "but-for" cause of Ridge and Rust's decision to discipline

6   plaintiff.   In March 2008, plaintiff encouraged an African-America co-worker, Owens, to file a

7   race discrimination complaint against Qwest.  Although Ridge states that he was not aware that

8   Owens had filed an external EEOC charge in March 2008, Ridge knew that Owens had filed an

9   internal race discrimination complaint against him personally in January 2008.  Dkt. 24 (Ridge

10  Decl.) at ¶ 8.  Moreover, Ridge admits that he blamed plaintiff for encouraging Owens to file

11  this earlier complaint.  Ridge asserts in his declaration that "at the time, I believed that

12  [plaintiff] might have triggered the complaint because he was always encouraging Boris

13  [Owens] and others to make complaints and with [plaintiff] race was a frequent topic of

14  conversation."  *Id.*  Furthermore, when plaintiff and Ridge had a disagreement on the morning

15  of April 8 before the investigatory interview, Ridge commented that plaintiff must have the

16  compliance/EEO discrimination hotline "on speed dial."  Dkt. 27 (Clemens Decl.) at ¶ 7.

17  Similarly, Rust knew that Owens had filed the internal EEO complaint against Ridge because

18  he had been interviewed by a Qwest attorney about the complaint in February 2008.  Dkt. 22

19  (Rust Decl.) at ¶ 9.[14]

20       Thus, viewing the evidence in the light most favorable to plaintiff, a reasonable jury

21  could find plaintiff's involvement in protected activities to be a "but-for" cause of Rust and

22  _____

23       [14] As discussed above, the parties disagree regarding when, exactly, Rust also learned
    about Owens' external EEOC charge against Qwest.  Dkt. 26 at 5; Dkt. 22 (Rust Decl.) at ¶ 9.
    During the April 29 investigatory interview, when plaintiff accused Rust of retaliating against
24  him, Rust stated that he was not aware of any EEOC complaint although plaintiff had e-mailed
    him about it the day before.  *See* Dkt. 22 (Rust Decl.), Ex. C.

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 28

Ridge's decision to retaliate by disciplining plaintiff for driving and talking on the phone without a hands-free device. Ridge and Rust held the first investigatory interview only a few weeks after plaintiff encouraged Owens to file the external EEO complaint (and only one week after plaintiff was interviewed by Qwest's counsel about that complaint), and Rust held the second interview the day after plaintiff emailed Rust regarding his involvement in Owens' complaint. *See Bell v. Clackamas County,* 341 F.3d 858, 865 (9th Cir. 2003) ("Temporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation in some cases."). As discussed above, "causation can be inferred from timing alone where an adverse employment actions follows on the heels of protected activity." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002).

After plaintiff was issued the written warning on May 5, Ridge and Rust continued to be involved in scrutinizing plaintiff's work at the Manson Construction, SeaTac, and Burger King sites. Their input contributed to Qwest's ultimate decision to terminate plaintiff.

        b.    *The Parties' Differing Accounts of the Manson Construction and SeaTac Outages Present Genuine Issues of Material Fact for Trial*

The parties' varying accounts of the Manson Construction and SeaTac outages in May and June 2008 present genuine issues of material fact that must be resolved by a jury at trial. Specifically, the parties disagree regarding whether plaintiff was responsible for the outages due to his failure to "flash test" the cases.

Qwest argues that there are no material facts in dispute because plaintiff admits that he pinched the cables and did not flash test the cases at either site. Dkt. 36 at 5. Qwest concedes that plaintiff had been having problems with his air compressor prior to the outages, but asserts

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 29

1   that plaintiff's air compressor was repaired just days before the events that resulted in the

2   outages and therefore the dry air was functional at the time.

3        Plaintiff has provided substantial evidence showing that he either did not have dry air in

4   his compressor at the Manson and SeaTac Construction sites, or at the very least reasonably

5   believed this to be true due to the broken gauge on his compressor. *See* Dkt. 27 (Clemens

6   Decl.) at ¶¶ 12, 14, 17; Dkt. 20 (Janke Decl.) at ¶ 2, Ex. A at 26 (Clemens Dep. 141:6-142:12).

7   Plaintiff asserts that service records indicate that his air compressor was repaired much later

8   than Qwest claims – on July 3, 2008.  Dkt. 27 (Clemens Decl.), Ex. C.  Moreover, on July 18,

9   2008, when Butler, plaintiff, and union representative Wylie jointly inspected the compressor

10   after a July 18 meeting with plaintiff, the compressor gauge on his air compressor was still not

11   working.  Dkt. 21 (Butler Decl.) at ¶ 17; Dkt. 20 (Janke Decl.) at ¶ 3, Ex. B at 42 (Wylie Dep.

12   48:11-12).  *See also* Dkt. 35 (Higgins Decl.), Ex. S (Salisbury Decl.) at ¶¶ 4-5 (providing that

13   although plaintiff's compressor "pushed air, the gauge on the compressor was broken,

14   unbeknownst to me.  Because of the gauge malfunction, Art Clemens could reasonably have

15   believed that the dry air compressor was broken.").

16        In any event, plaintiff contends that Qwest was responsible for his failure to flash test

17   the cases because he had advised his supervisor of the problem.  Specifically, before the

18   Manson Construction job, plaintiff asserts that he advised Ridge that his compressor was not

19   working, and Ridge instructed him to just "do the best you can."  Dkt. 27 (Clemens Decl.) at ¶

20   15, Ex. C (compressor service records); Dkt. 20 (Janke Decl.), Ex. A (Clemens Dep. 142:16-

21   143:3); Dkt. 24 (Ridge Decl.) at ¶ 15.  Immediately after the Manson Construction outage on

22   May 29, plaintiff "again told Ridge that my compressor was not working, and that it was the

23   cause of the Manson Construction outage.  Yet I was still told to do work without a fully

24   functional air compressor."  *Id*. at ¶ 15; Dkt. 24 (Ridge Decl.) at ¶ 15.

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 30

Moreover, although Qwest argues that plaintiff should have used Owens' air compressor at the SeaTac site to flash test the case, because Owens' van was also present and presumably had a working compressor, plaintiff has presented several declarations from co-workers asserting that flash testing the case or repairing the cable at this site would not have prevented the outage. This particular section of cable was problematic long before plaintiff worked on it on June 3, and remained problematic for months thereafter because there was a leak in the entrance cable that ran under the street that technicians are unable to replace. *See* Dkt. 34 (Steward Decl.) at ¶¶ 3-5 (asserting that "there is nothing any technician could have done to prevent this cable from going wet again" because a technician cannot replace the damaged cable that was running under the street); Dkt. 28 (Markhart Decl.) at ¶ 5 (noting that after plaintiff was fired the SeaTac cable went wet and was out of service again despite the cable being properly dried and pressurized by other technicians); Dkt. 30 (Wylie Decl.) at ¶ 5 (noting that the SeaTac cable went wet again, although two other employees worked on the cable after plaintiff); Dkt. 31 (Owens Decl.) at ¶ 9 (noting that the SeaTac cable was wet again despite numerous technicians' attempts to fix it and therefore the problem was from a wet cable, and not plaintiff's failure to pressurize the case). Thus, the parties disagree regarding whether plaintiff is responsible for the outages at the Manson Construction and SeaTac sites, and this presents genuine issues of material fact.

c.    *Plaintiff's Failure to Restore Service to the Burger King*
*on June 2, 2008 Presents a Genuine Issue of Material Fact*

The parties also disagree regarding whether plaintiff is responsible for failing to fix the Burger King outage because he failed to locate the UDC box during the 31 minutes he was on site on June 2, 2008. Dkt. 22 (Rust Decl.) at ¶ 13; Dkt. 39 (Second Butler Decl.) at ¶7, Ex. A (plaintiff's WFA records from June 2, 2008 at Burger King). Plaintiff asserts that he is not at

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 31

1    fault because the Burger King manager on duty at the time did not know where the UDC box

2    was located and therefore could not help plaintiff find it.  Dkt. 27 (Clemens Decl.) at ¶ 18.

3    Qwest points out that when Ridge visited the site the next day with a technician, an employee

4    led them right to the UDC box and the technician was quickly able to restore service.  Dkt. 24

5    (Ridge Decl.) at ¶ 16.  However, Ridge admits that the UDC box was improperly located close

6    to the floor in a storage room behind a mop and some Styrofoam cups.  Dkt. 35, Ex. C (Ridge

7    Dep. 49:2-50:15).  *See also* Dkt. 35 (Higgins Decl.), Ex. I (photograph of the box).

8         Thus, the parties disagree regarding whether it was reasonable for plaintiff to have

9    failed to locate the box because items in the closet may have concealed the UDC box from

10   plaintiff's view.  Plaintiff also points out that while he was disciplined for failing to locate the

11   UDC box, two other Caucasian technicians were also unable to restore service to the Burger

12   King on the same day but were not disciplined.  Dkt. 35 (Higgins Decl.), Ex. L (Written

13   Warning for employee R.P. for different conduct).  The parties' disagreement regarding

14   plaintiff's performance at the Burger King presents a genuine issue of material fact.

15              d.    *Plaintiff's Reporting of Time on June 8, 2008*

16        Although it is undisputed that there were discrepancies between plaintiff's WFA and

17   GPS records on June 8, 2008, the parties disagree regarding whether the reasons for these

18   discrepancies warrant discipline.  Plaintiff testified that there was a discrepancy after he

19   completed his first job of the day because he was waiting to hear back from his supervisor,

20   Ridge, about whether he should complete the second job or go home.  Dkt. 27 (Clemens Decl.)

21   at ¶ 19.  With respect to plaintiff's failure to close out the second job until the third one was

22   completed, plaintiff testified that he made an honest mistake and forgot to close it out until he

23   completed the third job but did so as soon as he realized his error.  *Id*. at ¶ 20.  When he closed

24   out the third job, he added 30-minutes to account for his lunch break.  He has provided

evidence that this was the standard practice for Qwest technicians. *See* Dkt. 29 (Green Decl.) at ¶ 11 (noting that technicians in the field must always be dispatched on a job in their WFA records, and so there are always times when WFA records show the technician is dispatched on a job when they are actually taking a break).

Although Qwest claims that it is "standard practice" for Qwest to review employee's phone records as part of the investigatory interview process, Qwest has not provided any evidence, such as phone records from that day, to contradict plaintiff's account. *See* Dkt. 41 (Second Decl. of Edwards) at ¶ B ("It was a common and regular practice at Qwest for managers to work with human resources to gather supporting documents during an investigation into an employee's behavior. Qwest regularly maintains employee cell phone records as part of its regularly conducted business activity."). For example, in plaintiff's August 4, 2008 termination meeting with Butler, plaintiff asked if Butler checked plaintiff's phone records to verify the explanation for his June 8 WFA records, and Butler indicated that he had not checked them. *See* Dkt. 30 (Wylie Decl.) at ¶ 4. The parties' disagreement about plaintiff's conduct on June 8 presents a genuine issue of material fact to be resolved at trial.

e.    *Evidence of Qwest's Disparate Treatment of Plaintiff*
      *Compared to Similarly Situated Employees*

In addition, plaintiff has provided evidence that Qwest disciplined him more severely than other similarly situated Caucasian employees who traveled out of route, inaccurately recorded time, or failed to complete a trouble ticket. Dkt. 26 at 15. Although these employees were also disciplined for conduct similar to plaintiff's, they were not terminated.

For example, S.R. had ongoing incidences of "disconnects in error" which caused customer service outages, and he inaccurately reported his time. He had seven previous incidents of discipline in a period of just one year, and there have been "recent issues"

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 33

involving a compliance investigation into unprofessional conduct.  Nevertheless, he has not

been terminated.  Dkt. 35 (Higgins Decl.), Ex. G (Edwards Dep. at 61:23-62:23); Dkt. 35

(Higgins Decl.), Ex. R (S.R.'s May 2007 Warning of Dismissal).

M.H. was rude to a coworker and customer, and may have lied about being able to

access a storage area he said was locked when the customer said it was not.  However, M.H.

was given the benefit of the doubt by Qwest.  M.H. hung up on Flores when she called to

schedule an investigatory interview, and during the interview, M.H. was uncooperative and did

not express remorse or "take ownership.  However, M.H. was not terminated and received only

a warning of dismissal.  Dkt. 35 (Higgins Decl.), Ex. R (M.R.'s October 2009 Warning of

Dismissal).

R.P. was a technician who was dispatched to the Burger King after plaintiff and was

also unable to resolve the issue, although he was not disciplined for this failure.  Dkt. 25

(Higgins Decl.), Ex. L (R.P.'s September 2008 Written Warning).  Apart from the Burger King

incident, he falsely reported having gone to a customer's residence and closing out a repair by

referring it to the cable maintenance technicians when he had not gone there at all.  His QJD

scores were also in the "needs improvement" range for four out of five months.  He also did

not take responsibility or express remorse, instead scrawling, "I DID NOT VIOLATE THE

QWEST CODE OF CONDUCT!" on his Written Warning.  He received only a written

warning.  *Id.*

Finally, S.M. was the Caucasian technician who worked with plaintiff on the last two

jobs of the day on June 8, 2008.  S.M. was not disciplined for his reporting or conduct that day,

and was still working at Qwest at the time of plaintiff's termination on August 4, 2008.  Dkt.

27 (Clemens Decl.) at ¶¶ 20-22.  *Compare* Dkt. 35 (Higgins Decl.), Ex. H (Butler Dep. at

126:6-20) (expressing his belief that S.M. left Qwest before any discipline resulted).

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 34

1   Caucasian employees who *were* terminated by Qwest for traveling out of route had

2   committed extraordinarily serious violations of policy.  Dkt. 26 at 14.  For example, G.L. was

3   terminated for visiting his parents' house and another person's house twenty-two different

4   times in excess of seven hours while on company time, visiting a grocery store seven times,

5   and spending over forty minutes more than allotted break and lunch periods during an eight-

6   day period.  Dkt. 23 (Griffith Decl.), Ex. D (July 2007 termination meeting notes).  N.L.

7   repeatedly failed to complete WAL forms that were required on a daily basis, and also stopped

8   at a gym 76 times for approximately 77 hours.  *Id.*, Ex. E (April 2009 termination meeting

9   notes).  *See also* Dkt. 23 (Griffith Decl.), Ex. F (employee terminated for several instances of

10  failing to stay current in load, charging more time in jobs than actually spent working on them,

11  traveling out of route, competing work without going to the premises, and parking truck for

12  hours at unrelated work addresses after previously having received a Warning of Dismissal for

13  this same conduct).

14   Accordingly, plaintiff has provided evidence suggesting that similarly situated

15  Caucasian employees were treated more favorably when they committed similar violations of

16  company policy, and were only terminated for much more severe infractions.  Viewing the

17  evidence in the light most favorable to plaintiff, there is a causal link between plaintiff's

18  termination and his race and protected activities.[15]

19

20   [15] Qwest asserts that although "employees that were terminated for traveling out of

21  route or inaccurately reporting time generally had more than one such occurrence, none of
    these employees had other significant performance issues at the time, equivalent to the three
    customer outrage issues Clemens had caused and/or failed to correct."  Dkt. 19 at 21.  *See also*

22  Dkt. 23 (Griffith Decl.) at ¶¶ 6-8, Exs. D-F at 50-60.  Qwest argues that it is plaintiff's errors
    on the job in May and June that "put him in a class by himself."  Dkt. 10 at 21. As discussed

23  above, however, genuine issues of material fact remain with respect to plaintiff's responsibility

24  for the customer outages at the Manson Construction site, SeaTac site, and Burger King.

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 35

1

e.    *HRC Findings Support Plaintiff's Claim of Discriminatory Intent*

2      Finally, the Court notes that the Human Rights Commission has considered the facts of

3  this case and made a "reasonable cause" finding which supports plaintiff's claims.  Dkt. 35

4  (Griffith Decl.), Ex. Q at 24.  Specifically, the Human Rights Commission found that "the

5  preponderance of the evidence supports a finding that [plaintiff] was subjected to different

6  treatment discharge based on race, different treatment terms and conditions of employment and

7  retaliation for opposing an unfair practice as defined by RCW 49.60."  *Id.*  The Court is not

8  persuaded by Qwest's argument that the Commission's findings are so riddled with errors that

9  it should be entitled to no weight.  *See Plummer v. Western Intern. Hotels Co., Inc.,* 656 F.2d

10  502, 505 (9th Cir. 1981) (noting that "[a]n EEOC determination, prepared by professional

11  investigators on behalf of an impartial agency, has been held to be a highly probative

12  evaluation of an individual's discrimination complaint," and any deficiencies in that decision

13  "would go to the weight to be given by the trier of fact to the EEOC determination.").[16]

14                          IV.    CONCLUSION

15      Accordingly, when the facts are construed in plaintiff's favor, a reasonable jury could

16  find that a discriminatory reason likely motivated Qwest to terminate plaintiff and that

17  //

18  //

19  //

20  //

21  //

22

23
          [16] In light of the Court's finding that there are genuine issues of material fact which
24  preclude summary judgment, any specific ruling on the parties' motions to strike would be
   immaterial to the outcome of this decision.  *See* Dkt. 36 at 15-16; Dkt. 43 at 2-3.

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 36

1   plaintiff's protected activity was a "but-for" cause of his termination.  Defendant's motion for

2   summary judgment, Dkt. 19, is DENIED.  All issues not specifically resolved herein are

3   reserved for subsequent disposition at trial.

4        DATED this 28th day of October, 2014.

5

6

7   JAMES P. DONOHUE
    United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT - 37